Mt. Ivy Press, L.P., & another[1] *vs.* Misha Defonseca.[2]

No. 13-P-606.

Middlesex. January 10, 2014. - April 29, 2014.

Present: Kantrowitz, Vuono, & Sullivan, JJ.

*Judgment,* Relief from judgment. *Practice, Civil,* Relief from judgment.

In a civil action brought by the plaintiffs as an independent action under Mass.R.Civ.P. 60(b), seeking relief from a judgment entered against them in an underlying civil action, a Superior Court judge properly allowed the plaintiffs' motion for summary judgment, where, regardless of whether the defendant's belief in her story (which gave rise to the circumstances on which the underlying action was based) was reasonable, the introduction of the actual facts of her history at the underlying trial could have made a significant difference in the jury's deliberations; accordingly, the underlying judgment was required to be vacated. [245-247]

Civil action commenced in the Superior Court Department on April 8, 2008.

After review by this court, 78 Mass. App. Ct. 340 (2010), the case was heard by *Thomas R. Murtagh,* J., on a motion for summary judgment.

*Misha Defonseca,* pro se.

*Brian S. McCormick* for the plaintiffs.

Kantrowitz, J. This is the third, and hopefully the last, of a trilogy of cases that have played out before us.[3] Having twice before considered issues relating to the publication of the defend-

---

[1]Jane Daniel.

[2]The underlying complaint indicates that she is also known as Monique De Wael. See *Mt. Ivy Press, L.P.* v. *Defonseca,* 78 Mass. App. Ct. 340, 340 n.2 (2010) (*Mt. Ivy II*).

[3]The main issues dealt with in the underlying case were copyright law and G. L. c. 93A. See *Lee* v. *Mt. Ivy Press, L.P.,* 63 Mass. App. Ct. 538 (2005) (*Mt. Ivy I*). Both *Mt. Ivy II* and the present appeal concern the efforts of the present plaintiffs to seek relief from the judgments in *Mt. Ivy I* by way of an independent action pursuant to Mass.R.Civ.P. 60(b), 365 Mass. 828 (1974).

ant's memoir of survival during the Holocaust (the details of which have now been revealed as false), we are now asked to decide whether it was proper for the court below to vacate a substantial judgment against the plaintiffs. We conclude that it was.

*Facts.* In 1995, Misha Defonseca entered into an agreement with plaintiff Jane Daniel and her company, Mt. Ivy Press, L.P. (Mt. Ivy), to publish a memoir of her experiences in Europe during the Holocaust. Entitled Misha: A Mémoire of the Holocaust Years, the work told the harrowing story of Defonseca's survival as a young girl during the Holocaust "thanks to her strong will and guile as well as, incredibly, the aid of a pack of wolves, who 'adopted' and protected her, providing food, companionship, and affection." The story even included her killing a Nazi soldier.[4] *Lee* v. *Mt. Ivy Press, L.P,* 63 Mass. App. Ct. 538, 539 (2005) (*Mt. Ivy I*). Since English was not Defonseca's native language, she was paired with a ghostwriter, Vera Lee,[5] to assist in the writing of the book. See *id.* at 540.

Throughout the publication process, Mt. Ivy and its principal, Jane Daniel, engaged in many highly improper representations and activities which need not be detailed here. See *Mt. Ivy I, supra* at 542-545. Suffice it to say that the improprieties resulted in a jury verdict against Daniel and Mt. Ivy in favor of Defonseca in the amount of $7.5 million, and for Lee in the amount of $3.3 million. The trial judge found for Lee and Defonseca on their G. L. c. 93A claims and trebled the damages, resulting in judgments of $9.9 million for Lee and $22.5 million for Defonseca. See *id.* at 546. This court affirmed the judgments. *Id.* at 562.

Following our decision in *Mt. Ivy I*, in a saga also worthy of a book or movie, Daniel doggedly pursued the question whether, in fact, Defonseca's tale was true.[6] Defonseca had claimed to have no knowledge of her true name, believing that she was the

---

[4]While the book struggled to find an audience in the United States, it was a bestseller in Europe and Canada. The book was translated into eighteen languages and was made into a feature film in France.

[5]Lee's credentials were impressive. She held multiple advanced degrees, including a Ph.D. in French. For nineteen years, she taught at Boston College and published several books and numerous articles.

[6]This was not the first time Daniel had made such inquiries. In her answers to interrogatories in the present matter, she described consultations with some

daughter of a Jewish couple named Reuven and Gerusha (she did not know their surname), and that she had been assigned the identity of Monique De Wael to protect her from the Nazis. Against this backdrop, Daniel pursued her inquiries.[7]

Among other efforts, Daniel secured the discovery assembled by her former attorneys. While sifting through the various documents, she came upon what appeared to be an innocent bank record. Startlingly, the document contained information, provided by Defonseca to the bank, indicating her date of birth, place of birth, and her mother's maiden name.

Armed with this information, Daniel expanded her search, seeking Defonseca's official records in Belgium. Stymied by the country's privacy regulations, Daniel contacted a genealogist in Belgium who investigated Catholic baptismal records in Etterbeek. Information was discovered corroborating that found in the bank record.[8]

With smoking gun in hand, Daniel returned to court to right what she perceived to be Defonseca's wrong. Daniel and Mt. Ivy filed an independent action under rule 60(b) against Defonseca and Lee, arguing that the hefty judgments be vacated. The plaintiffs met with defeat. In the trial court, on the defendants' motion to dismiss pursuant to Mass.R.Civ.P. 12(b)(6), 365 Mass. 754 (1974), the motion judge (first motion judge) dismissed the claim for failure to show "extraordinary circumstances" that might warrant relief under rule 60(b)(6).[9] See *Mt. Ivy II,* 78

---

eight sources prior to the book's publication; about half lent support to the veracity of the story, and half did not.

[7]Daniel's search was made easier thanks to technological advances. See *Mt. Ivy II,* 78 Mass. App. Ct. at 344 n.14 ("Daniel's search was successful largely because of technological advances, including the Internet, which allowed her to correspond with others on a world-wide scale not previously possible or practicable").

[8]A baptismal record was found for Monica Ernestine Josephine De Wael, born May 12, 1937, in Etterbeek, Belgium, to Robert Henri Ernest De Wael and Josephine Donvil.

The complaint also suggested that a Belgian school record for 1943 to 1944 showing the enrollment of a "Monique Dewael" pertained to Defonseca. See *Mt. Ivy II,* 78 Mass. App. Ct. at 344. We note, however, that the date of birth for that student was indicated to be September 2, rather than May 12, 1937. The parties agree that Defonseca was born on May 12.

[9]The first motion judge found:

"[The conduct of Daniel and Mt. Ivy] is not made any less egregious

Mass. App. Ct. 340, 345 (2010) (*Mt. Ivy II*), and cases cited. The plaintiffs appealed, and the case returned to our court, where their fortunes partially turned.

In *Mt. Ivy II*, we reversed the judgment insofar as it dismissed the claim against Defonseca, observing that "[Daniel and Mt. Ivy] have alleged an extraordinary fraud that touched every part of Defonseca's case against them and resulted in a huge verdict. It is true, as [Defonseca] point[s] out, that the book's authenticity was not the central issue at trial. Despite this, it is difficult to imagine that this information, had it been known to Daniel and Mt. Ivy, would not have provided a meritorious defense to at least some of the claims, especially those claims based on the contract. . . . It is equally implausible to suggest that the information, if it had been presented to the jury, would not have affected the substantial rights of the parties." *Id.* at 348 (quotation and citations omitted).[10]

Thereafter, Daniel and Defonseca engaged in discovery proceedings in Superior Court, and in July, 2012, a judge of that court (second motion judge) allowed the plaintiffs' motion for summary judgment on their complaint for rule 60(b) relief, vacating the underlying judgment for Defonseca.[11] Before us,

because of what we now know. . . . Whether Defonseca should profit from or be punished for her bad conduct is not the question for this court. The only question is whether Defonseca's bad conduct should absolve [Daniel and Mt. Ivy] from their own bad conduct six years after entry of judgment. It bears noting that it is not, as claimed by [Daniel and Mt. Ivy], Defonseca's conduct that caused harm to [them]. It was their own conduct that not only caused a jury to find against them across the board, but caused a Superior Court judge to find their conduct so egregious that it warranted treble damages and attorneys' fees."

[10]Lee, on the other hand, fared much better. Since she was not accused of fraud or any wrongdoing, her award was upheld. *Mt. Ivy II*, 78 Mass. App. Ct. at 350-351.

[11]The second motion judge concluded in his memorandum of decision that even if Defonseca believed her story, "the pervasive untruths told by [Defonseca] to the jury so infected the process that it would be manifestly unconscionable to let the verdict stand." See *Sahin* v. *Sahin*, 435 Mass. 396, 402 (2001), quoting from *Hazel-Atlas Glass Co.* v. *Hartford-Empire Co.*, 322 U.S. 238, 244-245 (1944) ("untimely bid for relief justified only where enforcement of judgment would be 'manifestly unconscionable' ").

Defonseca appeals, claiming that the second motion judge erred in allowing the plaintiffs' motion for summary judgment on their independent action for rule 60(b) relief.

*Discussion.* "Rule 60 sets forth a comprehensive framework for obtaining relief from a final judgment or order, balancing the competing needs for finality and flexibility to be certain that justice is done in light of all the facts." *Sahin* v. *Sahin*, 435 Mass. 396, 399-400 (2001).

Rule 60(b) provides, in pertinent part, as follows:

> "On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party . . . or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order or proceeding was entered or taken. . . . This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to set aside a judgment for fraud upon the court."

When a complaint seeking relief under rule 60(b)(6) is filed as part of the original underlying action, our review is for abuse of discretion. *Owens* v. *Mukendi*, 448 Mass. 66, 71-72 (2006). Where, as here, a rule 60(b) claim is brought as an independent action, our review is de novo. See *Mt. Ivy II*, 78 Mass. App. Ct. at 347 n.18. We thus consider the summary judgment materials in the light most favorable to Defonseca, the nonmoving party.[12] See *Locator Servs. Group, Ltd.* v. *Treasurer & Receiver Gen.*, 443 Mass. 837, 845-846 (2005).

---

[12]We note that, due to the differing posture of the case in *Mt. Ivy II* (the plaintiffs' appeal from the allowance of the defendants' motion to dismiss pursuant to rule 12[b][6]), we there took all the facts asserted in the plaintiffs' complaint as true. See *Mt. Ivy II*, 78 Mass. App. Ct. at 341 n.6.

The present case is unique. The falsity of the story is undisputed. The summary judgment materials in the record appendix establish that Defonseca was born Monica Ernestine Josephine De Wael, on May 12, 1937, in Etterbeek, Belgium, and was baptized on May 19, 1937. See note 8, *supra.*

Under oath, Defonseca averred that, notwithstanding her present understanding that her story was false, she believed throughout the book production process and trial underlying *Mt. Ivy I* that her story was true; her parents were in fact taken away when she was four years old and murdered in Nazi concentration camps;[13] and, last, she believed herself to be a Jew, and in fact joined a temple and was bat mizvahed after she emigrated to the United States.

The book contract between Defonseca and Mt. Ivy provided: "The Author [Defonseca] represents and warrants . . . that . . . with respect to the Work as submitted by the Author, . . . (vii) all statements of fact are true or based upon reasonable belief." Here, we express no opinion whether Defonseca's belief in the veracity of her story was "reasonable."[14] We also acknowledge the findings of the first motion judge in his memorandum on the rule 12(b)(6) motion, that the plaintiffs' conduct "is not made any less egregious because of what we now know." See note 9, *supra.* However, we agree with the second motion judge that, whether Defonseca's belief was reasonable or not, the introduction in evidence of the actual

---

[13]We note that the newspaper article referenced in *Mt. Ivy II*, 78 Mass. App. Ct. at 344 n.13, purportedly stating that Defonseca's father collaborated with the Nazis, does not appear in the record appendix. The record does include a Boston Globe article from February 29, 2008, reporting that Sharon Sergeant (a researcher assisting Daniel) "discovered that Defonseca's parents . . . were arrested and executed by the Nazis." Although no affidavit from Sergeant appears in the record on appeal, Defonseca affirmed these facts. Upon questioning at her deposition, Defonseca also stated that, as a child, she had been taunted at school as a "dirty German," but she did not know why. She stated that she learned in 2008 that her father had spoken to the Nazis under torture.

[14]The second motion judge faulted Defonseca for not providing an expert affidavit to establish the reasonableness of her belief in her story. In her reply brief, Defonseca provides an affidavit from a French writer indicating that in the course of writing a book about her, he interviewed Boris Cyrulnik, a psychiatrist who was himself a victim of the Nazis as a child. The reply brief indicates that the transcript of the interview is attached. We have been unable to locate such an attachment in the briefs provided.

facts of her history at the trial underlying *Mt. Ivy I* could have made a significant difference in the jury's deliberations. See *Mt. Ivy II*, 78 Mass. App. Ct. at 348. The underlying judgment in *Mt. Ivy I* must therefore be vacated.[15]

*Conclusion.* This case has had a legal life of over fifteen years.[16] All involved have been bloodied. Defonseca's story has been shown to be false. As for Daniel, she also has been shown to have acted highly inappropriately, as evidenced by the still valid multimillion dollar judgment against her in favor of Vera Lee, the one least blameworthy person in the entire affair. Hopefully the saga has now come to an end.

We affirm the summary judgment in the present appeal.

*So ordered.*

---

[15]It is the extraordinary damages awarded to Defonseca in the underlying suit ($22.5 million after trebling of the c. 93A award) that make retention of that award "manifestly unconscionable," as the second motion judge found. Contrast *Sahin* v. *Sahin*, 435 Mass. at 401-403, and cases cited. The second motion judge did not reach the plaintiffs' allegation of fraud on the court, see *Mt. Ivy II*, 78 Mass. App. Ct. at 349-350. Given the result we reach, we need not address it.

[16]Lee first filed suit against Mt. Ivy and Daniel in 1998. *Mt. Ivy I*, 63 Mass. App. Ct. at 545.